WILLIAM FLAUGH v. EGAN CHEVROLET, INC.[1]

May 13, 1938.

Nos. 31,533, 31,586.

[1]Reported in 279 N. W. 582.

616

*Kerr, O'Neill & Cragg,* for plaintiff-appellant.

*Oppenheimer, Dickson, Hodgson, Brown & Donnelly,* for defendant-appellant.

PETERSON, JUSTICE.

On the morning of August 8, 1936, plaintiff, standing at the southwest corner of Concord street and Grand avenue in South St. Paul, was struck and injured by a runaway automobile, which it is alleged was owned by defendant and negligently parked on Grand avenue, where it goes down a rather steep hill, by one Campion, defendant's alleged agent. The car ran down the hill, over the sidewalk, and hit plaintiff.

DEFENDANT'S APPEAL.

■ The first claim of defendant is that as a matter of law it was not the owner of the automobile, in consequence of which Campion cannot be deemed its agent in the operation thereof under the provisions of L. 1933, c. 351, § 4 (3 Mason Minn. St. 1936 Supp. § 2720-104) that whenever any automobile shall be operated upon any public highway with the express or implied consent of the owner the operator shall be deemed the agent of the owner in the operation thereof. Owner as used in c. 351 has been held to mean an owner as defined in 3 Mason Minn. St. 1936 Supp. § 2672, which reads: "Any person, firm, association or corporation owning or renting a motor vehicle, or having the exclusive use thereof, under a lease or otherwise, for a period of greater than 30 days." Holmes v. Lilygren Motor Co. Inc. 201 Minn. 44, 275 N. W. 416, 417.

Plaintiff claims to have proved that defendant was the owner of the automobile by showing that it was then registered in defendant's name under the state motor vehicle law. Defendant admits the registration, contends that it has conclusively proved that, while the registration was in its name, the legal title and ownership of the automobile was in Campion, to whom it claims to have sold the car under conditional sales contract, pursuant to which it made delivery to him, and that Campion had possession and exercised control of the same. The registration of the car under the state motor vehicle law in defendant's name was *prima facie*, but not conclusive, evidence of defendant's ownership. Holmes v. Lilygren Motor Co. Inc. *supra;* Bolton-Swanby Co. v. Owens, 201 Minn. 162, 275 N. W. 855; Delano v. La Bounty, 62 Wash. 595, 114 P. 434. Registration pursuant to the statute does not establish or determine title to a vehicle. Evidence is admissible to show that the title is different than that appearing from the registration. Bolton-Swanby Co. v. Owens, *supra;* 22 Minn. L. Rev. 720. In determining ownership, the entire arrangement between the parties may be shown. All facts that tend to show ownership may be considered, and where the facts are disputed the issue is for the jury. Holmes v. Lilygren Motor Co. Inc. and Bolton-Swanby Co. v. Owens, *supra.*

Defendant contends that it overcame its *prima facie* ownership by what it characterizes as uncontradicted evidence that it sold the car to Campion under conditional sales contract, which was filed as required by law; that the sale was followed by actual delivery of possession of the car to Campion, who exercised full and complete control over it; that the conditional sales contract was sold to a finance company like any other contract for the sale of a car; that Campion paid for the car; that it was insured against loss in his name; and that he paid for all repairs, gas, and oil used in its operation. Plaintiff contends that this evidence, taken at its face value, does not establish Campion's ownership as a matter of law, citing Holmes v. Lilygren Motor Co. Inc. *supra,* where we so held and said that a showing of possession and use [201 Minn. 46] "does not dispose of the legal effect of the bill of sale and the transfer of the license registration card." But plaintiff goes further and contends that the evidence is of such a character as not to compel belief. There is evidence that Campion was defendant's employe as a salesman and that about ten such salesmen were provided with automobiles to be used as demonstrators in the same manner; that defendant acquired title to the automobile from the manufacturer and that on the very day the conditional sales contract was signed, defendant, through its authorized agent, filed an affidavit with the secretary of state as registrar of motor vehicles to register the car in its name as owner. In the affidavit it was required to state whether its ownership was absolute or conditional, which it stated was absolute. It is fair to presume that when defendant filed the affidavit with the statement of ownership of the car it intended to comply with and not defeat one of the purposes of the statute, stated in Holmes v. Lilygren Motor Co. Inc. *supra,* that the records in the secretary of state's office disclose ownership and in a measure protect subsequent purchasers. Standing alone, the statement of absolute ownership in the affidavit was an admission by defendant which may properly be regarded as evidence of its ownership. An admission discredits the party's present claim and tends to prove the fact of its incorrectness. 2 Dunnell, Minn. Dig. (2 ed.) §§ 3408 to 3429; 2 Wigmore, Evidence (2 ed.) § 1048,

pp. 504-507. When considered in connection with all the evidence in the case, a sworn admission such as we have here might be quite persuasive. It is not to be thought that defendant would expose its officers and agents to the penalties of perjury, prescribed by 1 Mason Minn. St. 1927, § 2676, for wilfully and knowingly making a false statement of ownership in the affidavit. While such a thing is possible, it is not probable because it is so reprehensible as almost to preclude the thought. Defendant gave as a reason for registering the car in its name that such registration would prevent Campion from disposing of the car without its consent. If Campion were in fact the owner of the car, it might have been registered in his name with a suitable arrangement to accomplish defendant's purpose. The conditional sales contract was in blank when signed by Campion, and there is nothing to show that he ever approved the contract as subsequently written. It does not embody all the alleged agreement between defendant and Campion because defendant's evidence is that the agreement was that Campion was to be the absolute owner, but that he would not sell the car for 90 days. No agreement not to sell appears in the conditional sales contract. There is a showing that there was no sale in fact and that the transaction was nothing but a paper transaction. It is undisputed that Campion never paid any cash for the car. Defendant contends, however, that Campion paid for the car out of commissions earned by him, against which payments due for the car were charged. In its attempt to show that Campion actually made the payments, defendant produced exhibits 5A, 5B, 5C, and 5D, loose leaves from an accrued commissions ledger, and exhibit 6, an account of Campion's maintenance and repair expenses. From the accrued commissions ledger it appears that Campion was credited with commissions and charged with various items which are explained for the most part only by a numerical posting reference. There is testimony that a "reckoning" was had at the end of every month, and this appears from the accrued commissions ledger by a pencil entry at the end of each month, representing the difference between the total of any credit standing from the previous month plus commissions credited during the month, and the total of debits itemed for

the month. These figures show that the "reckoning" at the end of the month represented no complete settlement with Campion because the difference, debit or credit, was not immediately adjusted, nor was it carried forward as a regular debit or credit entry. It was merely figured in when a debit or credit balance for a following month was computed. Exhibit 6 shows that some of the debit charges were for gas and repairs. The charge of $60 on August 5, 1936, is explained on the ledger "Fidelity." This shows *prima facie* that the company charged Campion on the accrued commissions ledger with that amount. The permissible inference is that defendant considered Campion indebted to it on August 5, 1936, for an amount it had paid to Fidelity, the finance company. It does not allow the inference that this charge was ever paid by Campion, because, since the debit or credit balance existing at the end of the month was not carried forward as a regular debit or credit entry, the ledger does not show that the commissions were actually diminished by the debit charges. Therefore it cannot be said from the ledger that the $60 charge was paid by Campion out of his commissions. This ambiguity is not resolved by other evidence because there is no testimony that the figure shown at the end of August, 1936, represented an amount actually owing to or by Campion. Upon this evidence the jury might have considered the $60 charge to be only an entry to offset the payment made to Fidelity by the company, with nothing to show that defendant held Campion to payment of the charge or that Campion paid it. The important matter is not whether defendant charged the payments to Campion on its books but whether Campion in fact actually made the payments. A book charge may be made without being a charge in fact. Inasmuch as defendant claims to have had regular monthly reckonings with Campion and the books are inconclusive because of their failure to show either payment in cash or deductions from Campion's credits of the amounts charged, it might be inferred that there were no reckonings, that Campion did not pay, and that defendant did not intend to make him pay. The unexplained failure of defendant to make the deductions from Campion's credits shown on its books to be available for payment or "reckon-

ing" as it claimed justifies the belief that payment was not thus exacted because there was no right to payment.

The evidence also shows that Campion did not have exclusive control of the car. Defendant's witness Egan testified that he expected the salesmen to exchange demonstrators so that each salesman could demonstrate models driven by other salesmen. He testified that Campion was the employe of defendant; that Campion was to use the car "exclusively for selling," and then he qualified the statement by saying that Campion was to have it for his own personal use also. The mere fact that defendant undertook to state under what conditions Campion was to have use of the car was in itself evidence that defendant regarded itself as the owner. The testimony proceeds upon the assumption that defendant was owner of the car. There is other evidence showing conduct on the part of defendant inconsistent with Campion's ownership. Defendant procured insurance in Campion's name to cover theft, collision, and loss by fire, but when the car was damaged in the amount of $175 the defendant made the repairs and settled with the insurer as though the policy were in its name. It is not shown that Campion was paid this money in cash or by credit to his account.

Plaintiff contends that the effect of the evidence is to show, first, a plan on the part of defendant to avoid responsibility for acts of its employes driving its cars, such as liability for their negligence and parking tags, and, secondly, that the arrangement facilitated a purpose of defendant to procure a fleet of demonstrators, upon the credit of its salesmen which it guaranteed by assignment of the contracts to a finance company, without investment of its own funds in the demonstrators. Where the alleged title in a party appears to be part of an arrangement between the parties for purposes other than *bona fide* ownership by the person ostensibly holding the title, the trier of fact may look through the form to the substance of the transaction and say that the semblance of ownership is not the reality. Jasinuk v. Lombard, 189 Minn. 594, 250 N. W. 568. The question of ownership was clearly for the jury upon the evidence. Holmes v. Lilygren Motor Co. Inc. 201 Minn. 44, 275 N. W. 416; Bolton-Swanby Co. v. Owens, 201 Minn. 162, 275

N. W. 855; Delano v. La Bounty, 62 Wash. 595, 114 P. 434; Tigue Sales Co. v. Reliance Motor Co. 207 Iowa, 567, 221 N. W. 514.

■ Defendant is liable under c. 351 if Campion was operating the automobile upon the highway with defendant's express or implied consent. Koski v. Muccilli, 201 Minn. 549, 277 N. W. 229; Steinle v. Beckwith, 198 Minn. 424, 270 N. W. 139. The only question was whether Campion operated the car with defendant's consent. Egan testified that Campion was employed by defendant as a salesman, paid upon commission, and that he had the right to use the car for both the defendant's and his own purposes, among which he specifically mentioned Campion's right to drive the car home at night and to drive it to work in the morning. Since operating comprehends parking, consent to operate includes parking as well. Under the evidence there can be no question that Campion parked the car upon the highway with defendant's consent. Since liability under c. 351 is predicated upon agency arising out of consent given to operate the car, defendant's contention that it is not liable because Campion was an independent contractor and not an employe is of no consequence.

■ Defendant contends that the accident resulted from Campion's operation of the car while not within the scope of his employment in that he had deviated from the direct route through South St. Paul on the way to work. While the evidence conclusively shows that when Campion parked the car he was on the direct route to his work, we do not consider it necessary to rest our decision on that circumstance. By the express terms of c. 351, the owner's responsibility for a driver's operation of his automobile is based upon the owner's consent to the operation of the car on a public highway by the driver. The consent of the owner is the vital matter. In Koski v. Muccilli, *supra,* we said that there is no formula by which to determine the fact of consent or its scope. Consent to operate a car is not coextensive or synonymous with scope of employment. They are two different concepts. There may be such consent when there is no employment. It is conceivable that there might be employment without consent. To hold that the scope of consent in cases of employer and employe is the scope of employment is to

adopt a test not sanctioned by the statute. An employe's authority to use the employer's car is measured by the consent given by the employer. It may be, probably usually is, expressly or impliedly limited to the scope of the employment. The consent may embrace acts outside, and it may be so restricted as not to include acts ordinarily within, the scope of the employment. Where the scope of employment measures the consent, it is because the parties have adopted it as the measure of consent, not because the scope of employment in itself is such measure. Abbey v. Northern States Power Co. 199 Minn. 41, 271 N. W. 122. There may be owner's responsibility based solely on consent in the absence of the relation of employer-employe. In Koski v. Muccilli and Steinle v. Beckwith, *supra,* we held that the owner was liable solely upon the basis of consent. The statute recognizes the present-day frequent use of automobiles by others than the owner where no relation exists between the owner and the driver which would at common law or in the absence of statute create liability on the part of the owner for the negligence of the driver. 5 Am. Jur. p. 732, § 397. The scope of the employment is not the measure of defendant's consent to Campion to operate the car. The contention in this case is not pertinent because Egan's testimony makes defendant's consent to Campion's use of the car extend to both its business and his personal uses. The use in question is clearly within that consent. The result is that defendant is liable under the statute. Koski v. Muccilli, Steinle v. Beckwith, and Abbey v. Northern States Power Co. *supra.*

## Plaintiff's Appeal.

Plaintiff asks that he be granted a new trial upon the issue of damages, or if that be denied, a new trial upon all the issues, upon the grounds that the verdict is inadequate. The verdict is for $2,400. Plaintiff at the time of the injury was 37 years of age. He sustained a fractured skull, permanent loss of from two-thirds to three-fourths of his hearing in his right ear, and an injury to his left shoulder, as a result of which at the time of the trial his left arm could not be raised above the shoulder. The skull fracture

reached from the top of his head down through the right ear. He was in the hospital for three months, during the first three weeks of which he was in an unconscious or semiconscious condition. He suffered severe pain. The trial was had six months after the accident, and at that time plaintiff still suffered from severe headaches and dizzy spells. Plaintiff's employment is in connection with the sale of horses, and his injuries incapacitate him from carrying on that employment. He testified that his average earnings were between $30 and $40 per week. Defendant's physician testified that the headaches, dizziness, and trouble with the shoulder would continue for about six months after the trial, but plaintiff's physician was of the opinion that the dizzy spells and injury to the shoulder were permanent. Defendant's physician also testified that the shoulder condition was due to an injury to the muscles and tissues of the shoulder area, but plaintiff's physician testified that the inability to raise the arm was due to an injury to the brain. Plaintiff's special damages, of which there was no contradiction, amounted to $1,686 for the services of physicians, nurses, and hospital. This does not take into account loss of earnings either before trial or the period it is conceded plaintiff would be incapacitated afterward. If plaintiff earned only $15 a week his loss of earnings during the period of admitted disability would be in excess of $700, and if he earned the sum which he stated his loss of earnings would be approximately $1,500. If we take the first figure the damages awarded would pay him only what he was out of pocket. Defendant contends, however, that both the injuries and the items of special damage are grossly exaggerated and that the jury was not bound to accept the evidence as being a fair statement of either the injuries or the amounts of special damage. Defendant did not offer any evidence to show the amount of the special damages. It claims that the special damages, including loss of wages, amount to approximately $1,209. But this is only a figure suggested by defendant. It is not based on evidence in the record.

A new trial may be granted on the ground that the damages awarded are inadequate. We appreciate that the matter of granting a new trial for inadequate damages rests largely within the

discretion of the trial court. But where it appears to us that the damages are entirely inadequate a new trial ought to be ordered. 5 Dunnell, Minn. Dig. (2 ed.) § 7141; Shearer v. Puent, 166 Minn. 425, 208 N. W. 182; Stenshoel v. G. N. Ry. Co. 142 Minn. 14, 170 N. W. 695; Kennedy v. C. M. & St. P. Ry. Co. 57 Minn. 227, 58 N. W. 878. In our judgment, the damages awarded in this case are entirely inadequate. It may be that inadequate damages were awarded as a compromise between the right of recovery and the amount of damages sustained. Where there is any suggestion of such a situation, a new trial should be a retrial of all issues. Shearer v. Puent, *supra*.

Affirmed on defendant's appeal.

Reversed on plaintiff's appeal and new trial granted.

MR. JUSTICE STONE, absent because of illness, took no part in the consideration or decision of this case.

---

[1]Reported in 279 N. W. 587.